```
 1

 2                  IN THE UNITED STATES DISTRICT COURT

 3                 FOR THE WESTERN DISTRICT OF VIRGINIA

 4                          ABINGDON DIVISION

 5   UNITED STATES OF AMERICA,      )
                                    )
 6                 Plaintiff,       )   Criminal Case No.
                                    )   1:20mj00084-PMJ/1:20cr00015-
 7   vs.                            )   JPJ-PMS
                                    )
 8   COLE CARINI,                   )
                                    )   REDACTED TRANSCRIPT
 9                 Defendant.       )
    _____

10

11                   TRANSCRIPT OF DETENTION HEARING
                      TESTIMONY OF KAREN CARINI ONLY
12            HONORABLE JUDGE PAMELA MEADE SARGENT PRESIDING
                         WEDNESDAY, JUNE 17, 2020
13
    _____
14

15

16

17
                        A P P E A R A N C E S
18
    On behalf of the United States:
19                 Zachary T. Lee
                   Whitney D. Pierce
20                 United States Attorneys Office
                   180 West Main Street, Suite B19
21                 Abingdon, VA  24210

22   On behalf of the Defendant:
                   John Thomas Stanford
23                 Federal Defenders Office
                   201 Abingdon Place
24                 Abingdon, VA  24211

25   Proceedings taken by Certified Court Reporter and transcribed
     using Computer-Aided Transcription
```

1    (Testimony of Karen Carini commenced at 2:08 p.m.)

2         MR. STANFORD:  Okay.  I'm going to call Karen

3    Carini.

4         THE COURT:  Ms. Carini, are you on the telephone?

5         MR. STANFORD:  Unmute yourself, Karen.

6         MS. CARINI:  Okay.  Can you hear me now?

7         THE COURT:  Yes, ma'am.  Ms. Carini, we can hear you

8    well.

9         MS. CARINI:  Okay.

10         THE COURT:  If you'll listen carefully, I'm going to

11    have the deputy clerk place you under oath.

12         MS. CARINI:  Okay.

13         THE CLERK:  Do you solemnly swear that the testimony

14    you're about to give in this case shall be the truth, the

15    whole truth, and nothing but the truth, so help you God?

16         THE COURT:  All right.  Mr. Stanford.

17         MR. STANFORD:  Thank you, Your Honor.

18              **KAREN MICHELLE CARINI,**

19    Called as a witness herein by the Defendant, having been first

20    duly sworn, was examined and testified as follows:

21              **DIRECT EXAMINATION**

22    BY MR. STANFORD:

23    Q.   Karen, can you state your name and spell it.

24    A.   Karen, K-a-r-e-n, Michelle, M-i-c-h-e-l-l-e, Carini,

25    C-a-r-i-n-i.

1   Q.   And, Ms. Carini, what is your relationship to Cole

2   Carini?

3   A.   I am his mother.

4   Q.   Okay.  How are you employed?

5   A.   I'm a retired teacher.

6   Q.   And where do you live?

7   A.   I live at ███████████ Richlands, Virginia.

8   Q.   And is that the residence that Cole was living at during

9   this incident?

10  A.   Yes.  He lived upstairs; I live downstairs.

11  Q.   Okay.  Who else lives there?

12  A.   My son Russell, and myself, and my son Neil Carini.

13  Q.   How old are they?

14  A.   Neil is 20.  RC is going to be a sophomore in high

15  school, he's 15.

16  Q.   Okay.  And where is Cole's father?

17  A.   He has been absent from the family for ten years.  He

18  only sends a support check but does not have any contact

19  whatsoever with his family or his children.

20  Q.   Okay.  Can you tell the Court briefly about Cole; sort of

21  his personality, any disorders that you know of.  Just talk

22  about him generally.

23  A.   Cole was diagnosed with ADHD/Autism in fourth grade and

24  compulsion problems.  He hyper focuses on things.  He would

25  not touch items for a while.  In the fourth grade I had to get

1   him intense therapy for that.  And he thought he would catch

2   germs from things, so he touched everything with a white

3   Kleenex.  So his teacher recommended him to get evaluated and

4   that's when he was evaluated.  And he began his intense

5   therapy there, I've list it on a piece of paper for John, with

6   a therapist named Dr. Stephen Bentley, and he also saw

7   Dr. Keeling for his medications.  Cole's been in some kind of

8   counseling since fourth grade and actively in counseling now.

9   And he is a very hard worker.  He is not a vindictive person.

10  He's not angry.  He doesn't hit back.  He's very humble.  He's

11  down on himself and needs to be able to see his own

12  self-worth.  And I believe he's very intelligent.  He was our

13  church liturgist.  He worked for several people mowing their

14  yards.  He had an employer, Michael Smith, who was a former

15  teacher, and he just built him a deck, put some birdhouses on

16  it.  He's also very creative.  When he focuses on the right

17  things, he's a very, very productive citizen, and I'm proud of

18  him.

19  Q.   And, Ms. Carini, you say he does work by building decks

20  and other things, woodwork.  Is it your understanding that the

21  nails and things that Agent Childers found, was that typical

22  stuff that he would use that on?

23  A.   Yes.  Cole was never very organized, and we had to work

24  on what's called executive functioning and that is your daily

25  life skills.  So we had to constantly remind him don't bring

```
 1   tools in the house, those kinds of things, because he was
 2   always working.  He never, never sat still.  And during the
 3   day he would be mowing lawns, working to maintain the
 4   properties for Michael Smith who has a lot of -- like I think
 5   a trailer park.  And Cole would work on the plumbing for
 6   people if they needed it.  And people would let them come in
 7   their home.  He's very likable.  I don't believe he would ever
 8   hurt anyone but himself.
 9   Q.   Okay.  Is he currently receiving counseling?
10   A.   Yes.  At Healing Waters in Cedar Bluff he sees a
11   psychiatrist for medications to help him not hyper focus and
12   also to help him to sleep.  Because Cole has always been a
13   very productive person.  He can always stay busy.  Even as a
14   child, he didn't really play with toys.  He doesn't have a
15   cell phone.  He's not into social media.  He likes to produce.
16   I know losing his hand is going to be one of the worst things
17   that he'll have to adapt to.
18   Q.   Let me stop you there.  What kind of medication does he
19   receive?
20   A.   He takes Adderall and Prozac.
21   Q.   Okay.  Is it your understanding that currently -- or at
22   least around this time that Cole was in a relationship?
23   A.   Yes.  And the girlfriend's name is Jamie King.
24   Q.   Okay.  And was that relationship sexual in nature?
25   A.   Yes, it was.
```

```
 1    Q.    Okay.  Now another thing that's been brought up in the

 2    complaint and the pre-trial services report is that several

 3    years back in 2016 he had a state charge for possessing

 4    explosives.  Are you aware of that?

 5    A.    Yes.  It was dismissed.

 6    Q.    Well, can you tell the Court the nature of that charge?

 7    Did that involve making things like this case alleges?

 8    A.    He had gotten a Tannerite target.  And when he shot it

 9    off -- he had adapted how it shot off.  But it was purchased

10    legally at a shop, Cabela's or -- I believe that's the name of

11    the shop -- by his aunt in Delaware.  So when he got home on

12    New Year's Day, he used that.  And for four years he was on --

13    well, he went through the case.  It was dismissed.  And for a

14    year he was on supervised probation and then he was on

15    unsupervised probation.  And he complied every time.  He met

16    all the requirements and conditions and passed.

17    Q.    And that's why his case was dismissed?

18    A.    Yes, on 9-9-19.  And we all felt Cole was doing very

19    well.  Even his counselor, Donna Offield.  The people he was

20    interacting with, our family members, people he worked for, we

21    all felt he was doing very well.

22    Q.    I was going to say, so you talked about how he was on

23    probation after he got convicted of that.  Was he also on

24    pretrial release before the case was resolved or was he held

25    in custody pending the resolution of that case?
```

```
 1    A.    He was in jail 15 days and then he came home with six

 2    months of an ankle bracelet.  And he was drug tested and

 3    passed all those drug tests for the continuation of the case.

 4    Q.    Was his pretrial release ever revoked or did he do pretty

 5    well on that?

 6    A.    He complied every time and he had no problems whatsoever.

 7    Q.    And so the case, it's my understanding, started January

 8    of 2016 and it ended three years and nine months later in

 9    September of 2019; correct?

10    A.    That's right.

11    Q.    So during that whole period, you know, absent maybe

12    15 days, he was being supervised and did pretty well?

13    A.    Yes.  He completed all conditions.

14    Q.    Okay.  Can you describe the day of this event.  Where

15    were you?  What was going on?

16    A.    I had just gotten home from a doctor's appointment in

17    Abingdon.  It was about 7:00 at night and Cole was upstairs, I

18    was downstairs, I believe that's how it was, and I was just

19    getting ready to take a shower because I was afraid COVID was

20    on me.  So I put my gown on and went into the TV room to tell

21    my other child that I was back home.  And while I was in

22    there, that is when Cole appeared in the entrance way and

23    says, "Mom, I need help.  I've had an accident."

24            When I got home I saw a note on the door from the

25    neighbor that said, "Cole needs to mow and weed eat."  So I
```

1   had told Cole that, hey, you need to go weed eat.  So I

2   thought maybe he was, you know, going to go weed eat.  The

3   next time I saw him, he was standing there saying, "Mom, I'm

4   hurt."

5   Q.   Okay.  So did you take him to the hospital?

6   A.   Yes.  I called 911, but it wasn't coming quick enough and

7   Cole was going to drive himself to the hospital because he

8   wanted to live.  He told me he was going to bleed to death.  I

9   told him, "No, I'll put my clothes on and we'll go."  I drove

10  him to the hospital.  And the first people to talk to the

11  responders was Russell, my 15-year-old, his youngest brother.

12  Q.   Okay.  Did he -- at some point he was -- he was Life

13  Flighted to Roanoke; is that correct?

14  A.   Yes, he was.  X-rays were taken of his hands and that's

15  when I knew he had missing fingers on his left hand.  He was

16  MedFlighted to Roanoke, and he was in a five-and-a-half-hour

17  surgery.

18  Q.   Okay.  And do you have any understanding of the kind of

19  pain medication he was on?

20  A.   Yes.  He was on four medications for pain.  And they were

21  very --

22  Q.   Four medications?

23  A.   Yes, four medications for pain.  And they're in the files

24  for Roanoke.  But the doctor told me when I actually got to

25  speak with the hand doctor that did the surgery on his hand --

```
 1    my concern was that he would get a prosthetic for the hand.

 2    Right now he has this on his left hand and the right hand has

 3    a pin and that will come out.  At the end of the month he'll

 4    have to have that addressed, because he may be able to get a

 5    prosthetic if he does physical therapy.  And I want him to

 6    have a chance to not be a cripple the rest of his life and to

 7    have some sense of productivity.  So we need to address not

 8    only the mental needs of my son but the physical needs of my

 9    son.

10    Q.   Okay.  I want to talk to you for a moment about some

11    other things in the complaint.  There was mention, and you've

12    heard it already, of this note that was found that purports to

13    connect him to the incel movement.  Do you have any knowledge

14    of that movement and what that's from?

15    A.   Yes.  That came from a bin in the red shed.  And I had

16    been cleaning the whole home to make sure it is safe for my

17    family now.  So, upon cleaning, I did find that bin and it was

18    from 2015/16.  There were birthday cards in it from that year.

19    And he was enrolled in a criminal justice class where he did

20    case studies on particular people for the class.  So that bin

21    was filled with videos and movies.  Cole is a very sentimental

22    person that kept things.  That's where I found other items

23    that would have been from that time period.

24    Q.   The complaint talks about, again, these nails and bolts

25    and stuff found in the room.  From your being in the room, did
```

1    you find any evidence of nails or bolts stuck in the ceiling

2    from like --

3    A.   No.  The only thing on the ceiling was a little bit of

4    duct tape and some blood.  But there was no shrapnel anywhere,

5    like embedded anywhere.

6    Q.   Okay.  The complaint also references that by this red

7    shed -- and this shed, is it your mother who lives directly

8    next door?

9    A.   Yes.  And we have an empty lot beside of that.

10   Q.   Okay.  And this shed is on her property; correct?

11   A.   It's on that empty lot that she owns.  But it was Cole's

12   shed and none of us ever went in it.

13   Q.   What is -- what are those pipes from -- or the PVC pipes

14   and all of that?

15   A.   Yes.  We had a pool that we had, an in-ground pool, for

16   30 years and my mom just filled it in.  So Cole was going to

17   put a shower and a sink in out there from the old pool house.

18   So he had engineered a way, sort of like Alaskan bush people

19   on TV, and Cole would do a lot of things like that all the

20   time; projects.  And he was thinking, I can make my shed like

21   a little cleanup place so my mom wouldn't be yelling at me for

22   getting everything dirty in the house.  So he had already

23   installed a sink and he had this shower out there to put the

24   pipings to it.  And, in his mind, that was going to be a place

25   for him to be able to clean up and do before he would come

1    into the real house.

2    Q.   Okay.  In the complaint it also mentions loose dirt that

3    was found around the shed.  And I think the ATF mentioned in

4    that person's training and experience this was a place used to

5    detonate bombs or something.  What is your understanding of

6    that?

7    A.   Cole has dug a well and there are pipes coming out to be

8    able to assimilate the structure for the showering and using

9    the sink for water.  That's when I was walking around the

10   building.

11   Q.   Okay.  It was also mentioned in the complaint that when

12   neighbors were interviewed that they would talk about hearing,

13   you know, popping sounds and stuff like that.  Can you give

14   any insight into what those might be?

15   A.   Yes.  I live in a neighborhood where there are two people

16   who actively target shoot muzzleloader guns; Craig Hunsaker

17   and Timothy on the hill up here.  And then there's also

18   fracking that goes on behind my house in West Port Cove and

19   they shot off in series of eight.  So we still hear the

20   banging now.  And it is a neighborhood with different types of

21   people here that it could be easily explained.  We also live

22   very close to a railroad track and highway with lots of

23   traffic.

24   Q.   Other than this incident, I mean, do you know if Cole --

25   you're home a lot, aren't you?

1    A.   Yes.  I stay at home.

2    Q.   Do you know of any other incidents or other incidents of

3    him just sort of setting off explosives throughout the day?

4    A.   No, sir.

5    Q.   Okay.

6    A.   No, sir.

7    Q.   Now, Ms. Carini, you say that you've -- or you've

8    thoroughly cleaned your house; is that correct?

9    A.   Yes.

10   Q.   And by that you mean you've tried to remove anything that

11   could be used in these kind of things, explosive devices;

12   correct?

13   A.   I greatly appreciate Micah Childers.  The officer was

14   very kind to me.  I told him I was concerned.  And he told me

15   sort of like what to look for; liquids in a fish bowl.  So I

16   did get rid of exactly what he told me to do.  I appreciate

17   that and told him I wanted to get help for my son.

18   Q.   What did he tell you to look for?

19   A.   A fish bowl with some clear liquid in it.  Then also

20   upstairs he said there might be some Mason jars with clear

21   liquid in it.  And then maybe out in the garage, look around

22   the perimeter for that thing.  He said it would not be

23   volatile or explosive.

24   Q.   Okay.  And you were able to find things like that and

25   clear them out of the residence?

1    A.    Yes.  I did find those three things he mentioned, and I

2    was very grateful for what he said to me.  He was very

3    helpful.

4    Q.    Okay.  Now, right now the testimony has been that Cole's

5    room is upstairs and it sounds like at least you were

6    downstairs, maybe other people are downstairs.  If Cole were

7    released and went home, is there any way you could

8    reconfigure -- have him come downstairs to be watched over

9    more closely?

10   A.    That is our plan.  And we feel he would do best in the

11   bedroom that would be downstairs as soon as you come in the

12   home and it would be the best place to be able to monitor

13   everything and for him to access, you know, because he's

14   handicapped.  And I believe that would be the best room for

15   him.  So we have rearranged the furniture and got it ready.

16   Q.    Okay.  As a retired school teacher, do you have the time

17   to give him constant monitoring?

18   A.    Yes.

19   Q.    Okay.  Is there anything else right now that's a big

20   distraction in your life that would take you away from

21   monitoring him?

22   A.    No, sir.  I'm not working and do not have -- I'm single.

23   And my son's well-being is number one.  And I really want to

24   help him to overcome this.

25   Q.    Okay.

```
 1              MR. STANFORD:  Your Honor, I think that's all I've

 2   got right now.

 3              THE COURT:  Mr. Lee, questions?

 4              Mr. Lee, do you have any questions?

 5              MR. LEE:  Yes, Your Honor, I do.

 6              Can you hear me now?

 7              THE COURT:  Yes.

 8                         CROSS-EXAMINATION

 9   BY MR. LEE:

10   Q.   Ms. Carini, I first want to start talking about the 2016

11   incident you've discussed.  Do you recall that incident?

12   A.   Yes.

13   Q.   As a matter of fact, you were present with your son when

14   law enforcement first responded to your residence, weren't

15   you?

16   A.   Yes.

17   Q.   And you were present when he was interviewed by law

18   enforcement?

19   A.   Partially.

20   Q.   Okay.

21   A.   They separated us, you know, into cars, and they wouldn't

22   let us back in the home until 10:30 that night.

23   Q.   Well that was -- that's not entirely true.  In fact, at

24   one time point in time you and your son went into the

25   residence and collected up a bunch of things and brought it
```

1   out to the police, didn't you?

2   A.   No.   I stayed on the outside of the home, and I told Cole

3   to go get the rest of the targets.   There were four in the

4   pack and he had shot one off.   So I told him to go get the

5   other three so they could see it.   He was allowed back

6   inside -- he was headed to go back inside and they decided to

7   arrest him at that point.   He was not allowed to go get it.

8   Q.   Okay.

9   A.   So he went and got it and gave it to them.

10          But, no, sir, I never went back in that house.   And

11   if I went to the restroom, they would go with me before to --

12   Q.   It's your testimony that all he was doing was being

13   involved with Tannerite?

14   A.   At that point, that is what -- yes.

15   Q.   Well --

16   A.   In January of 2016.

17   Q.   Okay.   Were you present when Cole stated to law

18   enforcement on the day that they were at your house in 2016

19   that he was not shooting targets, he was making blasting caps

20   with the Tannerite?   That he was putting gun powder in metal

21   pipes and blowing them up?

22   A.   I don't remember the details of him saying all that.   All

23   I remember is he said that he didn't just shoot the target,

24   that he had made blasting caps.   That's what I recall.

25   Q.   In fact, you and your son and -- either provided to or

1   know that pieces of galvanized pipe that had been exploded

2   were seized from your residence, weren't they?

3   A.   They searched -- they took a lot of stuff that day and

4   it's all listed there on a piece of paper.  I'm not sure.  It

5   was four years ago.  But it's all on a piece of paper.

6   Q.   And that piece of paper included firecrackers, partial

7   Co2 cartridges, galvanized end caps, fragments of galvanized

8   pipe, altered Co2 cartridges, three tubes of Tannerite, a

9   notebook, and some loose drawings.  Does that sound about

10  right?

11  A.   Yeah.

12  Q.   Okay.  So it's not just Tannerite we're talking about, is

13  it?

14  A.   It's the items you mentioned.

15  Q.   All right.  So you weren't entirely truthful when you

16  said it was just about some Tannerite in your home, were you?

17  A.   Well, sir, at that moment I was summarizing.  I didn't

18  know I was going to have to -- I wasn't insinuating that it

19  was just something.

20          This is something that my son needs help for.  I

21  want him to get the help he needs.  I hope the Court has mercy

22  on him.  I'm not here -- it's a not about defending my son.

23  It's about getting the help my son needs.  The rest of his

24  life he's going to go around like this.  So I want him to have

25  a chance at life, liberty, and pursuit of happiness.

1   Q.   Bottom line, Ms. Carini, in 2016 your son was making pipe

2   bombs, wasn't he?

3   A.   I did not know that.

4   Q.   Now you said that when -- June 2nd of 2020, when your son

5   blew his hand -- his fingers off that he was upstairs when you

6   got home; is that correct?

7   A.   He must have been.  I thought -- I didn't -- I yelled

8   out, "Hey, Cole, you've got this note on the door."  And I'm

9   going to be honest with you, it's very shocking to see your

10  child in that shape.  And the timeline is, basically, I got

11  him to the hospital and he's MedFlighted and he's alive.  So

12  it's -- I had no idea what was going on.

13  Q.   I want to go back to 2016.  Your son had a semi-automatic

14  handgun in his room, didn't he?

15  A.   No.

16  Q.   Was there a pistol found in your house during the search

17  of it?

18  A.   Not that I remember.

19  Q.   Are you sure?

20  A.   I don't remember.  I don't remember.  It's been four

21  years ago, and I've been through a lot of stress and so I do

22  not remember.

23  Q.   And what actually happened in court is your son pled nolo

24  contendre and the charge was taken under advisement for two

25  years until September of 2019; correct?

1    A.   On 9-9-19 it was dismissed, and I was very grateful, very

2    hopeful.

3    Q.   So going back to the date of the most recent incident,

4    you said you assume your son was upstairs and then the next

5    you saw him he was in front of you with his hands severely

6    injured; is that correct?

7    A.   He was in the entranceway of the home where the blood

8    spatter is.  And I have pictures of that.  That's where he was

9    at.  And he said, "I've had an accident and I need to get to

10   the hospital.  I don't want to die."

11   Q.   Okay.  And that's not entirely the extent of what

12   happened, is it?

13   A.   I was so concerned about getting him to where -- I was

14   in -- you can listen to the 911 call.  I was in a state of

15   shock myself for hours afterwards.  I don't even remember

16   driving to the hospital.  I just remember --

17   Q.   Okay.  You're not in shock now, are you?

18   A.   No, sir.

19   Q.   Do you remember when Special Agent Childers interviewed

20   you about the incident?

21   A.   I was giving him the key to get into my grandmother's

22   house, the next -- two days after.

23   Q.   Okay.  And he wanted to know what happened that night --

24   or that day; correct?

25   A.   Yes.

1    Q.   And you started to talk about a lawn mower accident,

2    didn't you?

3    A.   That's what my son had told me it was, and I believed my

4    son at the time.

5    Q.   Actually --

6    A.   Especially because of the note on the front door.

7    Q.   But the agent stopped you and told you to tell the truth.

8    And then what did you tell the agent?

9    A.   I told him the truth.

10   Q.   You told him that you heard a pop or some sort of

11   explosion, didn't you?

12   A.   No.  He asked me if I had.  And I had to stop and think.

13   And then I said, it wasn't like a -- it wasn't like an

14   explosion.  No, I didn't hear anything that loud.  It was

15   muffled.

16   Q.   Well what did you hear?

17   A.   Yeah, it could have been.

18        A muffled sound like a pop, pop bottle opening, Coke

19   can.

20   Q.   And yet you still told law enforcement at the medical

21   center that this was a lawn mower accident; is that correct?

22   A.   I never spoke to -- I was believing my son at that time.

23   There was a note on the door that said you need to mow and

24   weed eat.

25   Q.   Okay.  You never heard the lawn mower, never saw the lawn

```
 1    mower?
 2    A.    Well, he mowed up the road.  And so, yeah, he had been
 3    mowing earlier in the day.  He had been working --
 4    Q.    How do you know that?
 5    A.    -- working on the lawn mower.
 6          Well you can tell somebody, I don't know, just --
 7    Q.    You didn't see him, did you?
 8    A.    No.  No, that's what he -- his routine.
 9    Q.    You don't --
10    A.    That's what his routine typically was.
11          I'm sorry, I misspoke.  I was gone to Abingdon that
12    day; you're correct.
13    Q.    Tell us about your son's drug use.
14    A.    I don't know about my son's drug use.
15    Q.    You don't know anything about him using methamphetamine?
16    A.    I do know that my son has told me that he has stopped all
17    that.  And the only thing I could say is he hangs around some
18    people that he shouldn't.  But I did not get in my son's --
19    he's 23 years old.
20    Q.    So when I asked you to tell us about your son's drug use
21    and you say you don't know anything about that, that's not
22    true, is it?
23    A.    I don't know the details about it, no, I do not.
24    Q.    You know he used -- or at least used to use
25    methamphetamine; correct?
```

```
 1   A.   At one point I do believe he did.  I never seen him do
 2   it.  I've never seen my son do it so, therefore, I cannot say
 3   100 percent.
 4   Q.   But you just testified he told you he wasn't doing that
 5   anymore.  Correct?
 6   A.   Right.  But I have never seen my son take drugs.
 7   Q.   You know Miss King -- is it Jamie King? -- is that his
 8   girlfriend?
 9   A.   Yes.
10   Q.   She's a drug user, isn't she?
11   A.   I do not know about Jamie King.
12   Q.   Well, who are these other people that he hangs around
13   with that he shouldn't?
14   A.   Neighbors.
15   Q.   And why shouldn't he hang around with them?
16   A.   They -- he shouldn't.
17   Q.   And why not?
18   A.   For reasons you stated.
19   Q.   Well, I want you to tell me why he shouldn't.
20   A.   Because he's worth more than that.
21        MR. LEE:  Your Honor, I'd ask the witness to answer
22   the question, please.
23        THE COURT:  Well, ma'am, if you know the answer to
24   the question, you have a legal obligation to answer the
25   questions truthfully.
```

```
 1              THE WITNESS:  Because he has a drug -- he has a lot
 2    of pending charges, and I don't want my children around those
 3    kind of people.  That's all I can say.  I don't know the
 4    person.  I don't interact with those people.  I just know what
 5    he's being charged with.
 6    BY MR. LEE:
 7    Q.   And what's he being charged with?
 8    A.   There's about 20 different things he's being charged
 9    with.  I looked them up and --
10    Q.   What are they?
11    A.   Driving without a license, using -- using meth, selling
12    drugs, transporting drugs, things like that.  Child
13    endangerment.
14    Q.   This is who your son hangs out with?
15    A.   No, he does not hang out with that person.  But he is a
16    neighbor that I have concern about that tries to use my son.
17    Q.   Ma'am, you talked about this note that's been referenced
18    discussing Eric Rogers, who was a domestic terrorist and in
19    the third person a violent -- carried out a violent act.  You
20    don't know where that was found, do you?
21    A.   Micah Childers would have to tell you that.
22    Q.   Okay.  So you don't know where it was found.
23    A.   He -- and I just heard him.  He said he found it in the
24    red shed.
25    Q.   Aside from being found in the shed, you don't know where
```

```
 1    that was found, do you?
 2    A.    I'm sorry, could you repeat that question?
 3    Q.    Aside from knowing that it was found in the shed, you
 4    don't know where in the shed it was found, do you?
 5    A.    You would have to ask Micah Childers.
 6    Q.    Okay.  So your testimony that it was in some red bin from
 7    2015, you don't know that to be true, do you?
 8    A.    If it was found in the shed, I -- I was cleaning and
 9    found items from that.  But no, Micah Childers would have to
10    tell you where he found that.  I didn't remove it.
11    Q.    Okay.  So your whole story that this is somehow related
12    to his criminal justice class, that's all speculation.  You
13    don't have a basis for that, do you?
14    A.    He was in a criminal justice class and did case studies,
15    yes, I do.  And he kept those things.  He even has his mace
16    agree (phonetic) workbooks that he kept, his nycotography
17    (phonetic) workbooks that he kept.
18    Q.    Ma'am, my question is you don't have any basis to testify
19    that this note is in anyway related to his criminal justice
20    class, do you?
21    A.    I believe that's where it came from.  But if I have a
22    basis or -- I don't understand the question.
23    Q.    It's pure speculation.  You don't have any idea, do you?
24    A.    Yes, I do have an idea.  I have seen my son's work when
25    he did it in 2016.
```

```
 1              THE COURT:  I'm sorry, Mr. Lee, for some reason
 2    we're not picking up your sound.
 3              MR. LEE:  Your Honor, I was speaking to Agent
 4    Childers.  I muted it.  May I have a second?
 5              THE COURT:  You may.  That's fine, just as long as
 6    we know.
 7              MR. LEE:  My apologies.
 8    BY MR. LEE:
 9    Q.   Ma'am, what is this neighbor's name that you've been
10    talking about that's got the multiple charges?
11    A.   He is Rodney Nichols.
12    Q.   Rodney Nichols?
13    A.   Yes.
14    Q.   Okay.
15              MR. LEE:  Your Honor, I don't believe I have any
16    further questions at this time.
17              THE COURT:  Mr. Stanford, further questions?
18              MR. STANFORD:  No, Your Honor.
19              THE COURT:  Ms. Carini, help me just a little bit
20    with the timeframe here.  Do you recall the day that your son
21    was injured?  What day it was?
22              THE WITNESS:  Yes.  It was June 2nd, Tuesday, at
23    7:10 p.m.
24              THE COURT:  And what time did you say that you
25    arrived home?
```

1          THE WITNESS:  I had gotten home probably about 6:30.

2   And I was walking outside for exercise, so I entered the home

3   about that same time he got hurt.  Probably about five minutes

4   before.

5          THE COURT:  So you'd been outside for about a half

6   an hour.

7          THE WITNESS:  Yes.  I was walking around.  Probably,

8   you know, because I have a very bad back.  And so I have to

9   walk to get -- to be able to -- just after sitting so long.

10          THE COURT:  And did you observe your son outside

11   mowing.

12          THE WITNESS:  I can't remember.  I don't think so,

13   no.

14          THE COURT:  Well, do you have a very big lot?

15          THE WITNESS:  Yes.  It's a very big lot with -- and

16   then he also mows up the road for the neighbor.  And I found

17   that note on the door and I just said, you know.

18          THE COURT:  Now, you said that you found a note.

19   Was it on your front door?

20          THE WITNESS:  Yes.  Because my neighbor said, "Cole,

21   it's time to mow and weed eat."  He was wanting Cole to come

22   mow and weed eat.

23          THE COURT:  And what neighbor was this?

24          THE WITNESS:  He is a man named Bill Nuckles.

25          THE COURT:  Any relation to the Mr. -- I think you

```
 1    said it was Mr. Nichols who was the other.

 2            THE WITNESS:  They're not related in any way.

 3            THE COURT:  So it looked like that Mr. Nuckles had

 4    just left a note on the door for Cole to remind him that it

 5    was time for him to mow and weed eat.

 6            THE WITNESS:  Right.

 7            THE COURT:  So when you were outside, you were home

 8    about 30 minutes before you ever went inside?

 9            THE WITNESS:  Yeah, I was trying to get a little bit

10    of exercise for my back because I had been sitting.  I was

11    just walking.  Our black top is pretty big there.  I was

12    trying to get in -- I have a lot of health problems.  I was

13    trying to exercise a little bit before I took my shower and

14    relaxed for the evening.

15            THE COURT:  All right.  So while you were there, did

16    you hear anything odd?  See anything odd while you were

17    outside the home?

18            THE WITNESS:  No.

19            THE COURT:  Okay.  And so you went in the home, and

20    I think you said you went in, did you go to a bedroom or a

21    bathroom area or somewhere to change?

22            THE WITNESS:  My bathroom, ma'am, is straight back

23    in my bedroom when you first come in and then the stairs is

24    here up to his facilities.  And I had gone back there and I

25    put on, you know, my robe.  I was going to take a shower, but
```

1    I said I'm going to go tell my youngest son, I remember now

2    after sitting and thinking about it, I said I have to tell him

3    that I'm back home.  And so that's when we heard like a, you

4    know, some kind of sound.  And he appeared in the entrance

5    way, Cole did.  And I was -- I mean, we were traumatized from

6    what we saw.  I'm doing my best to tell the details to help my

7    son.

8              THE COURT:  Well, I mean, what we need to do is tell

9    the details as truthfully as possible.

10             THE WITNESS:  I am, ma'am.  That's all I can tell

11   you is that I remember -- and I drove him to the hospital and

12   he was bloody.  And there's blood everywhere where he was

13   standing.

14             THE COURT:  So you heard -- describe what you heard.

15   Before you knew that your son had been injured, what did you

16   hear?

17             THE WITNESS:  I was in the bathroom.  I got the

18   note.  I think Cole had gotten home himself.  I can't

19   remember.  It's kind of a blur.  But when I got home, I went

20   in to the bathroom to take a shower.  And I said, oh, I need

21   to go tell Russ that I'm home.  I went down to the end -- it's

22   a 40-foot room.  I was about 40 feet away, and I sat down in

23   my recliner and I looked over at Russ and said are you hungry?

24   Do you need something to eat?  Things like that.  Then we

25   heard that noise.  Next thing I know, I see Cole there and

1  he's got his hands bandaged, "Mom, I need to get to the

2  hospital.  I don't want to die.  I had an accident."

3           THE COURT:  And so did he come downstairs?

4           THE WITNESS:  I don't know, because I was in the

5  room where you can't see the stairs.  And I just -- I stood up

6  and heard him say, "Mom, I need to go to the hospital."  And I

7  saw him standing there.  He had blood everywhere.  You know,

8  it was in his face and everything was damaged.  It was very

9  traumatic to my child and to me.

10          THE COURT:  At that moment did you ask him what

11 happened?

12          THE WITNESS:  No, I just was -- I called 911, and I

13 said look, my son's had an accident.  Look, I don't want him

14 to die.  You can listen to the 911 call.  I went in my

15 bathroom and put my clothes on.  I'm driving down the road and

16 Cole's like, they're not getting here soon enough, I'll just

17 drive myself.  I don't want to die.  I said no, I will take

18 you on.  And so I took him to the hospital.  And he bled in

19 the van too.

20          When we got there, he said I could get on out.  He

21 said, "Mom, I can't open the door."  And that's when I knew

22 something was wrong with his hands.  I had never looked

23 because I was about to vomit.

24          THE COURT:  But your testimony is you didn't -- when

25 he showed up there with all the blood, you didn't ask what

1  happened.

2          THE WITNESS:  No, ma'am.  I'm trying to save my

3  son's life.  You can listen to the 911 call.  I was like help

4  me, help me.  I was in a state of shock.  I couldn't even

5  remember my name.  It was so traumatizing.  You can ask my

6  15-year-old.  It's not something -- when you see someone in

7  that shape, it's very traumatic.  And I'm struggling to

8  remember because it's very traumatic to me.

9          The last time I touched my son was to pick up pieces

10  of his hand that I found in his room.  It's very traumatic to

11  me.  I've been through a lot.  I would have never laid my head

12  down in the house knowing that was in there, and I told that

13  to Mr. Childers.

14          THE COURT:  So, I mean, you do believe now that an

15  explosion occurred in your son's bedroom; correct?

16          THE WITNESS:  From the evidence that they have

17  shared, yes.  And I am very, very alarmed by that.  And I want

18  my son to get the help he needs.  And I know my house is safe

19  now, but we need to address the needs of what's going on and

20  help.  I ask you to have mercy.

21          THE COURT:  When did you --

22          THE WITNESS:  He hurt himself.  But he's given

23  himself a life sentence with his maimed hands.

24          THE COURT:  Ma'am, when did you find this, the

25  remains of your son's hand in his room?

```
 1              THE WITNESS:  When I was cleaning his room --
 2   because I have to live in this house.  I don't have anywhere
 3   else to go -- and so I was -- Mr. Childers told me there was a
 4   couple things I needed to get rid of anyway.  I was cleaning
 5   up where they had looked through everything.  Everything was
 6   in disarray.  But we have to live here.  So I was cleaning and
 7   I found three pieces of my son.
 8              THE COURT:  Now did I understand you to say that
 9   your son was in therapy, actively?
10              THE WITNESS:  Yes.  Since fourth grade.  I've always
11   had my son in some kind of counseling.
12              THE COURT:  And did I understand you to say that he
13   was treating with a psychiatrist currently, before this
14   accident?
15              THE WITNESS:  Yes, ma'am.  He's on Prozac and
16   Adderall.
17              THE COURT:  And what was he taking the Prozac for?
18              THE WITNESS:  Depression.  Anxiety.  She said that
19   it would help him to -- with his moods.  You know, not to be
20   down.  He had very low self-worth.  After the first case, you
21   know, he couldn't find a job.  Lots of things.  So it would
22   help him with his depression, which I think he was diagnosed
23   with depression.  You'll have to look at the files and see.  I
24   don't want to misspeak about something, you know, officially,
25   but I do believe that's what it was.
```

```
 1            THE COURT:  Mr. Lee, further questions?
 2            MR. LEE:  Just briefly, Your Honor.
 3                 CROSS-EXAMINATION (continued)
 4   BY MR. LEE:
 5   Q.   Ms. Carini, I want to take you back to the 2016 incident.
 6   There was drug paraphernalia found in your home, wasn't there?
 7   A.   At that time I do believe there was.  I do believe you're
 8   right.
 9   Q.   Okay.  And there was a container with a green leafy
10   substance believed to be marijuana found; correct?
11   A.   Correct.  Whatever is in that report is correct.
12   Q.   Okay.  A partial container of rifle powder, additional
13   Co2 cartridges, a Disruptor Avon shotgun round, and then a
14   number of bottle rockets.  Does that sound right?
15   A.   If it's in the report what they found, they would not
16   lie.
17   Q.   Okay.  So did you know your son was using drugs in your
18   house?
19   A.   No, sir.
20   Q.   So back in 2016 he was able to hide drug use and the
21   manufacturing of explosives from you; is that correct?
22   A.   Yes.
23   Q.   All right.  And now fast forwarding to June of 2020, did
24   you know that your son was producing the highly dangerous
25   explosive TATP in your home?
```

```
1    A.    No, sir.   I would have never laid my head down in that
2    house if I had knowed that.
3    Q.    Okay.   Did you know he was creating a pressure cooker
4    bomb in your house?
5    A.    No, sir.
6    Q.    Okay.   So he -- if your testimony is to be believed, he
7    was able to hide all that from you also?
8    A.    He was.
9    Q.    And if your testimony is to be believed, when he blew off
10   almost all the fingers on one hand and severely damaged his
11   other hand, you believe that that was from a lawn mower
12   accident?
13   A.    He -- I didn't see the wound.   He had everything in a
14   tourniquet.   So I believed him, yes.   When he told me that, I
15   believed my son, yes.
16   Q.    Okay.   So he was able to hide the fact that he'd blown
17   his hand off almost from you; correct? if your testimony is to
18   be believed.
19   A.    Yes.
20   Q.    Okay.   And yet you think you can adequately supervise him
21   if he's to be released to your home, knowing that he was able
22   to hide all of these things from you, convince you of this
23   lawn mower accident?
24   A.    I am not a perfect person.   Yes, he did hide things from
25   me.   Do I think he's a different person after this accident?
```

```
 1    Yes, sir, I do believe that he would be safe.  And I'm not
 2    afraid of my son.  I want to make it clear, yeah, he did hide
 3    things from me, and I did not go into his room.  I did not go
 4    upstairs.  I just beg mercy for my son.  Whatever can be to
 5    help my son.
 6              MR. LEE:  No further questions, Your Honor.
 7              THE COURT:  Mr. Stanford, further questions?
 8              MR. STANFORD:  Just one, Your Honor.
 9                     REDIRECT EXAMINATION
10    BY MR. STANFORD:
11    Q.   Ms. Carini, if the Court does release him on bond,
12    sometimes the Court has people serve as a third-party
13    custodian, which means you'd have to monitor what he's doing
14    and actively go and check on these things.  And if you saw any
15    way that he's violated his release conditions, you would have
16    to report that.  And is that something you feel you'd be
17    comfortable doing?
18    A.   Yes, sir.
19    Q.   Okay.  And you feel like you know what you're looking for
20    this time?
21    A.   Yes.
22    Q.   Okay.
23              MR. STANFORD:  That's all I've got, Your Honor.
24              THE COURT:  Ms. Carini, have you spoken with your
25    son since you talked to him at the hospital?
```

```
 1              THE WITNESS:  Yes.  We had a very good conversation.
 2              THE COURT:  And has he told you what happened to
 3     him?
 4              THE WITNESS:  We have not discussed details.  But my
 5     son told me in an e-mail, "Mom, I felt more sorry for you than
 6     me because no mother should see her son in that shape.  I'm so
 7     sorry."
 8              And he wants to live a better life.  He's not making
 9     excuses.  He knows what he did was wrong, what he did to me
10     was wrong.  And he wants to have a better life.  He knows he
11     needs help.  And he can be helped.  And that's the main thing
12     is that he was in a bad place.  I think he -- I think he's a
13     different person now, you know, the shock of it, the injuries,
14     the lifetime of living differently with one hand.  He has a
15     lot to -- a trauma.  We all have trauma.  And he needs those
16     trauma injuries -- I believe need to be addressed physically
17     so that he can use his hand to the best of his -- for the rest
18     of his life.  If he needs physical therapy, I want him to get
19     it.  You know, 39 hours after he had his hands repaired, he
20     was off of pain medicine and in jail.  And he endured that.
21     And he's faithful and he prays.  Did he do wrong?  Yes, he
22     did.  And he knows that he did wrong.  And he is willing to
23     face the consequences for what he did is what he told me and
24     he wants to live a better life.  And he hurt himself.
25              THE COURT:  Ma'am, let me ask you this.
```

1          You say he know he's done wrong.  What has he said

2    to you that he did wrong?

3          THE WITNESS:  That's all he said.  He said, I know I

4    did wrong, you know, because he's maimed.  He says, you know,

5    I know right from wrong.  My son knows right from wrong and he

6    needs help.  That's all he said.  I mean, we were on the jail

7    phone and it's recorded.  But when we were talking, you know,

8    I think that's the first step in getting help is knowing I

9    need it.  And knowing that, you know, I want my son to get

10   help.  I need you to help me.

11         THE COURT:  Ma'am, my question to you is this:  From

12   the time of this accident until today, have you asked your son

13   what happened to you?

14         THE WITNESS:  I did.  And he said he blew his

15   fingers off when he was making targets to shoot.

16         THE COURT:  So he's now admitted to you that his

17   hands were injured in an explosion?

18         THE WITNESS:  In just sort of like one or two

19   sentences, that's what he said.  He did not intend to hurt

20   anyone.  But he hurt himself more than anybody.

21         THE COURT:  And you've heard the testimony today

22   with regard to what was found in your home; correct?

23         THE WITNESS:  Yes.  And I'm surprised by that.  I am

24   shocked.  I did not know what TATP looks like.  I don't know

25   what peroxide and ammonia looks like.  There's no way that I'm

1    a scientist or chemist, I don't understand.  After cleaning

2    the room up and Mr. Childers advised me, I understand a little

3    bit more about it.  Now I know what it looks like.  But I was

4    clueless.  I really thought my son was doing well.  So did his

5    counselor, the psychiatrist, the people he was working for.

6            THE COURT:  All right.  Anything further, Mr. Lee?

7            MR. LEE:  No, Your Honor.

8            THE COURT:  Mr. Stanford?

9            MR. STANFORD:  No, Your Honor.

10           I will -- I don't have any more questions, if that's

11   what you were asking, of Ms. Carini.

12           The only thing -- yes.

13           THE COURT:  Thank you, Ms. Carini.

14       (Testimony of Ms. Carini concluded at 3:00 p.m.)

15

16                              **INDEX**

17   **DEFENSE WITNESSES:**                                **PAGE**

18   **KAREN MICHELLE CARINI**
             DIRECT EXAMINATION BY MR. STANFORD          2
19           CROSS-EXAMINATION BY MR. LEE               14
             CROSS-EXAMINATION (CONTINUED)              31
20           BY MR. LEE
             REDIRECT EXAMINATION BY MR. STANFORD       33

21

22

23

24

25

1          **REPORTER'S CERTIFICATE**

2

3          I, DONNA J. PRATHER, do hereby certify that the

4     above and foregoing, consisting of the preceding 36 pages,

5     constitutes a true and accurate transcript of my stenographic

6     notes and is a full, true and complete transcript of the

7     proceedings to the best of my ability.

8          Dated this 7th day of July, 2020.

9

10         DONNA J. PRATHER, RPR, CRR, CBC, CCP

11         Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25