**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ABINGDON**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **V.** ) | **Case No. 1:20-cr-00015** |
| ) | |
| **COLE CARINI** ) | |

**UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR UPWARD VARIANCE**

Pursuant to Rule 32(i)(1)(C) of the Federal Rules of Criminal Procedure, the United States hereby comments on matters relating to an appropriate sentence for Cole Carini. According to the Presentence Investigation Report, Carini's calculated sentencing range is twenty-four to thirty months. ECF No. 55 ¶ 59. The government, however, seeks a sentence that varies above the Guidelines range. Based on the factors set forth in 18 U.S.C. § 3553(a), the government recommends a prison sentence of ten years.

**Background**

*"[Y]eah I norma[lly] have no emotion even when I should so for me to form a bond with another human is a big deal. Meth does get me happy and bubbly that's why I got so obsessed with it because nothing else in life has an emotional response ex[c]ept thrills of explosions or something extre[]me."*

–Cole Carini, November 17, 2018[1]

Law enforcement first learned of Cole Carini's infatuation with explosives on January 1, 2016. It was then that the Tazewell Sheriff's Department dispatched Sergeant Stephen Turner to a report of an explosion in Richlands, Virginia. *See* Exhibit 3 at 10.

---

[1] *See* Exhibit 1; Exhibit 2 at 4.

One resident reported that he had seen Cole Carini running from the scene and throwing something behind a building.  *Id.*  Eventually, Sergeant Turner was able to find Carini at his family residence.  *Id.* at 10–11.



*Carini's Family Residence*

Carini told Sergeant Turner that he had been firing a shotgun at "reactive targets" (also known by the brand name "Tannerite").  *Id.* at 11.  A "reactive target" is a type of target that explodes when shot with a high-velocity projectile.  Soon, however, it became apparent that Carini had not been truthful with Sergeant Turner.  *Id.* at 11–12.  After more questioning, Carini explained that he had not actually *shot* a reactive target, but that he had detonated it using "makeshift blasting caps" ignited by a fuze.  *Id.* at 12.  These "blasting caps" turned out to be metal tubes filled with gun powder.  *Id.* at 12, 17.

Search warrants executed at Carini's house uncovered modified $CO_2$ cartridges, fragments of a galvanized pipe, an endcap for a galvanized pipe, three tubes of Tannerite,

2

and other items. *Id.* at 17. (Galvanized pipes are commonly used to make improvised explosive devices known as "pipe bombs.") Ultimately, Carini pled *nolo contendere* to two counts of manufacturing explosive devices (see *id.* at 15), and he served probation until September 2019. ECF No. 55 ¶ 31.

Before long, however, Carini's infatuation with explosives reclaimed law enforcement's attention. On June 2, 2020, Carini was taken to the hospital with amputated fingers and shrapnel wounds to his face and neck. *See* ECF No. 1 at 3; ECF No. 55 ¶ 4–5. When the FBI interviewed Carini about what had happened, he lied once again. Carini told agents that his lawn mower had flipped over and that he had fallen into the spinning blade. What actually happened was that Carini had accidentally detonated homemade Triacetone Triperoxide ("TATP")—a high explosive—in his bedroom. When the FBI searched Carini's bedroom, they found blood, flesh, shrapnel, tattered blinds, and other obvious signs of an explosion.



*Carini's Bedroom*

3

Agents also found a large quantity of TATP, a box of rusty nails, a pouch of BBs, extensive writings and drawings relating to explosives, PVC pipes, fuzing, and instructions for making TATP and Hexamethylene Triperoxide Diamine ("HMTD"—another high explosive).



*Instructions for Making HMTD and TATP on the Wall Above Carini's Bed*



*A Diagram of an Explosive Device in One of Carini's Notebooks*

4



*A Diagram of a Pressure Cooker Explosive Device*



*Pouch of BBs*



*Contents of Pouch of BBs*

Elsewhere, agents found more PVC pipes, loose wires, empty peroxide containers, and the modified pressure-cooker device that is at the center of this case.



*Pressure Cooker Device*

In a shed near the house, agents found a makeshift lab for synthesizing explosive materials.

6



*Inside of Shed, Showing Hotplate*

Also in the shed, agents found a scrap of paper that described someone armed with "deadly objects" approaching cheerleaders and "passing the point of no return." The writing concluded: "He decided I will not back down I will not be afraid of con[se]quences no matter what I will be heroic I will make a statement like Elliot Rodgers."



*Portion of Note Referring to Elliot Rodger*

7

Elliot Rodger was a twenty-three-year-old mass murderer who, in 2014, killed six people and injured fourteen others by gunshot, stabbing, and vehicle-ramming.

### Examination of Items Seized from Carini's Residence

After collecting evidence from Carini's residence, the FBI sent them off for analysis. FBI Forensic Examiner Jack Barrow, Ph.D., determined that the collected items included five partially constructed Improvised Explosive Devices ("IEDs"), materials necessary to fully construct IEDs, and drawings and descriptions of IED construction. *See generally* Exhibit 4. Device #1 was the pressure-cooker device described in the Indictment, which Carini had sealed with hardware and loaded with TATP and BBs. Dr. Barrow is expected to testify that Carini's device was like the devices used in the Boston Marathon bombing of April 2013, but that Carini's device could have been far more destructive.



*Device #1—Pressure Cooker Device Showing BBs and Pipe Placement*



*X-Ray Image of Device #1*

Device #2 was a large PVC pipe with a "priming hole" drilled in the side. Priming holes are used to incorporate fuzing into explosive devices.



*Device #2—PVC Pipe with Priming Hole*

9



*Carini's Drawing of Priming Hole in Cylinder*

Device #3 was a plastic container containing HMTD residue, fitted with a partial electric-fuzing system.



*Device #3—Container with Partial Electric Fuzing System*

10

This particular device was designed to use a battery or other electricity-source to pass current through a thin-gauge "bridge wire" that would heat up and detonate an explosive material.



*X-Ray Image of Device #3 Showing "Bridge Wire"*

Device #4 was another PVC pipe with a partial electric-fuzing system.



*Device #4—Wrapped PVC Pipe with Partial Electric Fuzing System*

Device #5 was a plastic jar wrapped in multiple layers of transparent tape, electrical tape, and foil tape.


*Device #5, Partially Disassembled*

The device contained TATP and two paper pouches. One of the pouches contained a low-explosive mixture of potassium chlorate and a starch-like fuel.

Aside from those five devices, Dr. Barrow also examined the remnants of IEDs seized from Carini's residence.


*CPVC Pipe with Blast Damage*

12

During his examination, Dr. Barrow also identified ammonium nitrate (another component used to make explosive material for IEDs), sulfur, nails, BBs, and fuzes.  In addition, Dr. Barrow noted that Carini's drawings and handwritten descriptions were sophisticated, and that they described fuzing circuits with remote initiation, pressure-cooker IEDs, pipe-bomb IEDs, explosive precursor lists, explosive recipes, terrorist events, military munitions, a 950-kilogram "barrel bomb," and large vehicle bombs.

### Cole Carini's Social Media

During the investigation, the FBI also examined Carini's Facebook account.  The examination revealed that Carini frequently used Facebook Messenger to talk with others about his obsession with explosives.  *See* Exhibit 2.  He referred to his experimentation with explosives as "science," and he devoted a large amount of time, energy, and money to his "science."  He also performed more than a dozen Facebook searches for explosives, and he exchanged photos and videos of explosives with others.  In May 2019, Carini described an incident at a parade, where a bomb-sniffing dog had detected traces of explosives on Carini.  Carini escaped further investigation by telling the dog's handler that he had simply been working with fertilizer.

### Events Since Carini's Arrest

For the past few years, Carini has been romantically involved with a woman named Jaime Keen.  During the investigation, Keen told agents that she and Carini frequently took drugs together and that she cared deeply for him.  After Carini was arrested and taken to

jail, Keen and Carini communicated with one another through phone and video calls, email, and letters.

During a video call in September 2020, Carini asked Keen to send drugs into the jail via hand-written letters. Keen told Carini about making drug-laced letters to mail to Carini, but she explained that she could not make them as well as Carini had made them in the past. During an FBI interview, Keen admitted to making a methamphetamine-laced letter, but claimed she did not send it to Carini. However, on September 14, 2020, during another video call, Keen and Carini made several references to the letter. Carini asked her how much methamphetamine the letter contained, and Keen told Carini it contained $60 worth and suggested that, at first, he only use the top half of the letter. Keen also told Carini that she mailed the letter on September 10, 2020, that he should receive it any day, and that Keen would mail him another letter containing more drugs the next morning.

## Discussion

When sentencing Carini, the Court must consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). In addition, the Court must consider the nature and circumstances of the offense and Carini's history and characteristics. *Id.*

In this case, an analysis of the § 3553(a) sentencing factors shows that a ten-year sentence is warranted. That sentence would appropriately reflect the seriousness of the

offense and the nature and circumstances of the offense, protect the public, account for Carini's history and characteristics, and afford adequate deterrence.

First, this was a serious offense, and the nature and circumstances of the offense are profoundly troubling. Carini's pressure-cooker device was similar to—but potentially more destructive than—the devices used in the Boston Marathon bombing that killed three people and injured hundreds of others. Were it not for the accidental explosion in Carini's bedroom, Carini's obsession with explosives could have resulted in a truly horrific event. Importantly, this was not an isolated incident or an aberration in Carini's behavior. Carini also constructed several other IEDs and synthesized high-explosives that he could have employed in any number of grim scenarios. A ten-year sentence would reflect the seriousness, the nature, and the circumstances of Carini's crime, while a sentence within the guidelines range of twenty-four to thirty months would not.

Second, Carini's history and characteristics weigh in favor of a ten-year sentence. Carini spent a great deal of time, energy, and money on his explosives "science." He synthesized explosive chemicals, constructed multiple IEDs, and recorded his disturbed thoughts and plans in extensive writings and drawings. This is the second time in Carini's young life that he has been in trouble with the law for making explosive devices, and the second time he has tried to lie his way out of the situation. To Carini, explosions are akin to a methamphetamine high:

> I norma[lly] have no emotion even when I should so for me to form a bond with another human is a big deal. Meth does get me happy and bubbly that's why I got so obsessed with it because nothing else in life has an emotional response ex[c]ept thrills of explosions or something extre[]me.

15

Exhibit 1. And methamphetamine's hold on Carini is so strong that it led him to enlist Keen's help in delivering methamphetamine-laced letters into jail. These facts go to Carini's history and characteristics, and they also demonstrate the need to protect the public from further crimes by Carini for as long as possible. There is no reason to believe that Carini's addictions have abated.

Finally, a ten-year sentence would provide a deterrent effect. There is a compelling need to deter Carini and other like-minded individuals from engaging in this sort of conduct. A ten-year sentence would appropriately satisfy that need. Deterrence is particularly important in cases like this one because of the human consequences that result when a person maliciously employs a destructive device. To the extent possible, the Court should endeavor to deter Carini, and others, from making "a statement like Elliot Rodger[]."

## Conclusion

The government asks the Court to sentence Carini to prison for ten years.

Date: June 21, 2021

Respectfully submitted,

DANIEL P. BUBAR
Acting United States Attorney

*s/ Whitney D. Pierce*
Zachary T. Lee
VSB No. 47087
Whitney D. Pierce
VSB No. 82520
Assistant United States Attorneys
U.S. Attorney's Office
180 West Main Street, Suite B19
Abingdon, Virginia 24210

276-628-4161
276-628-7399 (fax)
USAVAW.ECFAbingdon@usdoj.gov

## **CERTIFICATE**

I hereby certify that I caused a true and correct copy of the foregoing to be filed using CM/ECF which will deliver notice and a copy of such filing to counsel for the defendant.

Date: June 21, 2021.

>*s/ Whitney D. Pierce*
>Whitney D. Pierce
>Assistant United States Attorney