IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

**UNITED STATES OF AMERICA**

                                                                                   Case No. 1:20CR00015

**v.**

**COLE CARINI**

_____

**COLE CARINI'S SENTENCING MEMORANDUM**

      Cole Carini, through counsel, asks this Court to consider a sentence within the advisory guideline range. A sentence within that range is reasonable and adequately accounts for the factors that the Court must consider under 18 U.S.C. § 3553(a). In support of that sentence, Cole offers this sentencing memorandum, as well as letters from family and friends, all of which are attached to this filing.

***Cole's Early Years***

      Cole was born in Bloomington, Indiana, and lived there until he was seven years old. During his young childhood, he lived with his mother, father, and two younger brothers. Cole's family moved to Louisville, Kentucky when he was seven years old and they remained intact until he was 10 years old. Cole had a good family life when he was school aged. But his father's behavior began changing when he was around four years old, which Cole attributed to the birth of his sibling, Neil. His father learned about his mother's infidelity around the same time his younger

brother was conceived. Cole recalls his father confronting his mother about her infidelity and being "impossible" to be around afterward.

Cole's parents separated, and his mother moved into an apartment on the outskirts of Louisville. His father was "unbearable at that point" and was angry all the time. Cole preferred to be with his mother, while his father favored his brother, Neil, even though he treated him meanly. Cole told his father he wanted to live at his mother's house and his father "hated that and kept trying to put him in a mental institution." His father broke his middle finger as a punishment, and Cole "couldn't stand him, because he always made jokes about me." Cole went to live with his mother, fulltime, at 10 years old, while his brothers remained with his father. Cole moved to Virginia and lived with his grandmother for a year before his mother retrieved his brothers and moved to Virginia. His mother went bankrupt after two divorces and needed to start over at Cole's grandmother's home. Cole's family life was "pretty good" during his middle school and high school years. He stated he was not picked on at school because he was big and tall.


[Cole at one of his high school's football games]

### *Cole's Mental Health, Substance Use, and Physical Health*

Cole was diagnosed as a child, around fourth grade, with Autism Spectrum Disorder, Attention-Deficit Disorder and Obsessive-Compulsive Disorder. He received sporadic treatment throughout the years.

Cole was prescribed Adderall shortly after his arrest when he was 19 years old. He stated, "I noticed it was really good. I took Adderall and antidepressants. It was a relief and I was on house arrest, would get a few hours to go to doctor appointments, and I took a lot of Adderall because I was bored. The Adderall was very effective, and I used a lot of it. It kept me perfectly focused and I felt much smarter when I was on it." When Cole took Adderall he become extremely focused, particularly on learning how Adderall worked. He explained, "I loved it and wanted to know how it looked, molecularly. I got obsessed with it because it caused me to hyper-focus on things. I would make things, fix things, research things. I had a clarity that I'd never had before. I researched everything I could find on particular topics – drugs, radiation, explosives – lots of things." While on Adderall, Cole created artwork and could draw pictures for over 15 hours with no breaks. He also learned a lot about drugs and wrote down their chemical compounds and studied them.

Cole became dependent on Adderall and substantially increased his usage in 2019. A coworker told him if he liked Adderall, he would like methamphetamine. Cole stated, "I thought if Adderall was good, then meth would be more powerful." His coworker took him to a female's house and he bought a small bag of

methamphetamine. Recalling his first time using meth: "I smoked it and I felt it instantly. It was not a high but it did have an effect. Before this, I thought Adderall was amazing. If I took a lot, my scalp would tingle and I felt euphoric. I felt I could do anything." A neighbor provided him with more methamphetamine but he took too much and it made him sick, so he stuck with Adderall until his probation ended. After that, Cole began using methamphetamine regularly.

### *Cole's Intellectual Interest in Explosives*

Cole developed an interest in explosives when he was 19 years old, and his interest began with fireworks. He initially researched what chemicals were powerful and took powders out of fireworks, added gunpowder, and set them off. Cole became interested in explosives "because of the effect it has." Cole was arrested in 2016 and charged with Manufacturing Explosives. *See* Ex. 3 of Government Sentencing Memorandum. Dkt.#57.  Shortly after his arrest Cole was evaluated by Cumberland Mountain Community Services for a Crisis Evaluation.

**Cumberland Mountain Community Services**
**CRISIS EVALUATION**

Check Reason for Completion    ⊙ Emergency/Crisis    ○ Acute Counseling Assessment
Disposition, On Call Crisis   ○ VOL    ⊙ Not Sent    ○ Referred to Acute Counseling    ○ Crisis Stabilization
Start Time:  1:45 PM         Stop Time:  2:45 PM         Total Time:  1 hr
Location of Service :   SWVRJA             Loc of Hospitalization:   Not Sent
Age:        19      DOB:  08/16/1996      SSN:  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      Gender  Male 0
Phone
Address:
City/State/Zip        TAZEWELL           VA    24641
Contact Type:   ○ TEL     ⊙ FTF
Does this consumer receive medicaid?    ○ Yes    ⊙ No
Medicaid Number
Present Situation:

> Cole was assessed at SWVRJA. He reports coming to jail 12 days prior for setting off pipe bombs in a field that he reports belongs to family. "I never meant to harm anyone." He reports he did this because he wanted to watch the bombs explode. He reports that he will not do this again and expresses remorse at using the explosives in the first place. He reports missing his family and that they need him to help around the home. He reports he lives with his mother and 3 younger male siblings. He reports " I learned a lot from my time I have been in jail." He appears very coherent and speaks clearly with a good vocabulary. He has fair eye contact. His mood is euthymic at time of assessment. He denies ever wanting to hurt anyone and reports he chose a field that was out of the way to experiment with the bombs. He reports that he does become "obsessed" with certain things. He reports a hx and current issue with "OCD" type behaviors. He reported that at this time his obsession was watching things destroyed. He reports " I became obsessed with how many bombs or explosives would actually go off at time of detonation." He reports that he has learned from his mistakes and is able to control his obsession to watch things destroyed namely rocks and buildings. He appears to be following protocol of current facility and no issues have been noted on this date. (see below for current mood and mental status summary).

After only 12 days incarcerated, Cole believed he "learned a lot" from his time in jail. He stated he never meant to hurt anyone and described how he became obsessed with explosives. Unfortunately, his prior short incarceration did not completely deter his interest in explosions. However, after having spent nearly a year in jail and losing portions of his hands he has now learned the lesson that didn't stick previously – creating explosives is dangerous and not a good hobby.

    Shortly after his arrest on the current charges, Cole explained, "You can see blasting videos and watch it. I really liked watching the effect – how big of a hole a blast could make, whether a tree would blow up, stuff like that." He explained he never liked to see anything gory and he focused on what was left following

explosions such as "28-foot long crater from a car bomb. That is pretty impressive." When Cole and his girlfriend were having problems, he spent less time with her and more time seeking places where he could detonate his explosive experiments. He explained it was difficult to find places but eventually found a field. He stated when he and his girlfriend were together, he could set them off in a field on her mother's property and his girlfriend would watch and listen. Cole has never wanted to set his explosives off in a manner that would harm people.

When asked about the pressure cooker that was found in his closet, Cole explained he thought about ideas for explosives and became "kinda extreme about it and pretty obsessed." He stated he figured he could fill a pressure cooker with explosives and that "when I was high, it seemed like a good idea." He stated he wanted to go as far as possible in the woods, tie it to a tree trunk or put it underground, and he had a fuse that was several feet long. He continued, "When I came down from the high, I thought it was way too much, so I took the lid back off and got the powder out."

Cole's intellectual interest in learning about criminal behavior started at the end of high school. He took a criminal justice class during his senior year in high school and learned of Elliot Rodger during the class and thought his motive was "unusual" so he watched a few documentaries about him. He explained, "I watched his videos, too. I don't agree with him though. He wrote with a sense of entitlement. I watched those when I was 19 and I haven't watched much about him since then."

When asked for his thoughts on explosions, society, and morality, Cole explained he never considered that some people would find his actions amoral or concerning because he wanted to have fun and see how far he could take it to include how big of a crater he could make or whether he could bring down a large tree. He stated, "I did it because it was fun and I got a thrill out of it. But I realized I had taken it way too far at the point when I had the accident that took off my fingers. I know it would have killed me if it was bigger. Once I was in jail, I realized this made me look like a terrorist." He explained he never wanted to hurt anyone, including himself.

Cole's life changed forever on June 3, 2020. Cole was in his bedroom making a firework out of a pill bottle. He planned on taking it out to a field later and setting it off beneath a cinderblock. Cole filled a Tylenol bottle with ammonium nitrate, a salt commonly found in fertilizer. In the middle of the bottle, Cole placed a tube that he filled with triacetone triperoxide (TATP), an igniting agent. The goal was to light a fuse that sets off the TATP, igniting the ammonium nitrate and causing the bottle to explode. Cole placed a piece of scotch tape over the end of the center tube to keep the TATP from escaping. Before he headed out to the field, he took a pair of scissors to remove the scotch tape to double check whether he had enough TATP. The friction from the scissors scraping against the tape accidentally set off the TATP, causing the bottle to explode in Cole's hand.

The room momentarily went dark. Cole stood in the middle of the room, disoriented. His body ached all over like he had just been in a car wreck. He

wondered whether the scissors he was holding had cut through him in the blast. He looked around and saw that his bedroom window was blown out. His blinds looked like swiss cheese from where the air escaped from the bottle, piercing them. And then he saw his hand. Or at least what used to be his hand. When Cole looked down he saw a bloody stump of a hand, where his four fingers used to be. As horrifying as that was, adrenalin and shock kicked in and Cole quickly acted to stop the bleeding and got help. He grabbed a towel in his room and rapped it around his stub.

      As Cole left his room, his mom, Karen Carini, met him at the top of the stairs. She complained of a popping sound she just heard. Cole pleaded with her for help, crying out for her to call 911. As she tried to assess the situation, Cole pushed past her and insisted on driving himself to the emergency room, if she wouldn't hurry up and drive him. Without fully understanding what happened, Karen followed her son down to the car, and drove him to the hospital. When they arrived, Cole was unable to open the door by himself and asked his mom for assistance—something he's never needed her help with before. But once he lifted up the towel, she understood why.




[left hand]                                          [right hand]

### *The 18 U.S.C. §3553(a) Factors Weigh in Favor of a Guideline Sentence*

One of the factors the Court must consider is the "nature and circumstance of the offense." 18 U.S.C. § 3553(a)(1). While the materials that Cole was experimenting with in this case were dangerous and capable of causing harm (as evidenced by his own injuries), Cole never intended to use those materials to harm anyone. In its sentencing memo, the government tries to compare Cole to domestic terrorists like the Boston Marathon Bombers and Elliot Rodger. Those comparisons

are misplaced. Cole didn't have any motive to harm others like those people did.[1] [2] Nor did law enforcement find any evidence that Cole had plans to harm anyone, and Cole doesn't have a history of harming people. The statement by the government that Cole "could have employed [his explosives] in any number of grim scenarios" is nothing but speculation.

The Court must also consider the history and characteristics of the defendant when imposing a sentence in this case. Cole's autism should weigh heavily in favor of a guideline sentence because of the difficulties that condition will cause him in prison. There are two sets of rules in prison – those in the inmate handbook and the prisoners' own set rules. Cole will be unable to parse the inmates' unspoken codes of conduct. Unable to read social cues and unable to detect danger. Unable to decipher between friend or foe. "In prison, what happens is you have official prison rules, and then you have unofficial prison rules where if you tell on someone, you get in a lot of trouble," says Brian Kelmar, co-founder of the nonprofit Legal Reform for People Intellectually and Developmentally Disabled.[3] "This is why [autistic people] get in trouble in the prisons."[4] The loss of his hand also makes Cole

---

[1] The brothers responsible for the Boston Marathon Bombings were motivated to commit the bombings because the United States was at war in Afghanistan and Iraq. *See* https://edition.cnn.com/2013/04/23/us/boston-attack.
[2] Elliot Rodger was part of the "Incel community"—a group of young men who consider themselves unable to attract women sexually. Elliot Rodger's motive for his crimes were, among other things, to punish women who had deprived him of sex. *See* https://www.smh.com.au/world/elliot-rodger-manifesto-outlines-plans-for-santa-barbara-attack-20140525-38wkc.html.
[3] https://www.spectrumnews.org/features/deep-dive/autism-behind-bars/
[4] *Id.*

susceptible to abuse. He will be unable to adequately defend himself from other inmates.

This Court is required to impose a sentence that deters Cole from committing future criminal conduct. The losses Cole has suffered in this case will do more to keep him from straying from the law than any sentence this Court can impose. Cole's injuries are a permanent, life-long deterrent. Every time he attempts to do one of the dozens of menial tasks we take for granted, he'll be reminded of what his conduct in this case has cost him. What are typically simple and routine tasks will now present as one obstacle after another:

- Making his bed
- Putting on socks
- Tying his shoes
- Putting on deodorant
- Buttoning a pair of pants or a shirt
- Opening bottles
- Cutting food
- Carrying heavy items
- typing

And on and on. Basic tasks like these will be difficult and time consuming. These daily frustrations will stay with him long after any prison sentence imposed and provide continual deterrence for the remainder of Cole's life.

For all these reasons, Cole Carini asks the Court to impose a sentence within the advisory guideline range.

Respectfully submitted,

Cole Carini
By Counsel

s/ John T. Stanford
Assistant Federal Public Defender
NC Bar No. 51664
201 Abingdon Place
Abingdon, VA 24211
Telephone: (276) 619-6089
Fax: (276) 619-6090

CERTIFICATE OF SERVICE

I certify that on June 24, 2021, a true copy of the foregoing was electronically filed with the clerk of the court using the Court's CM/ECF electronic filing system and that to my knowledge and belief this document will be electronically sent to counsel of record.

s/ John T. Stanford